Rel: August 29, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2025

_____

## CL-2024-0974

_____

### Elise Tomeny

### v.

### Patrick Tomeny

### Appeal from Madison Circuit Court
### (DR-23-900221)

EDWARDS, Judge.

Elise Tomeny ("the wife") appeals from a judgment entered by the Madison Circuit Court ("the trial court") divorcing her from Patrick Tomeny ("the husband"). For the reasons set forth herein, we affirm the trial court's judgment insofar as it awarded the husband final decision-

making authority regarding P.E.T., whose date of birth is May 12, 2025, and G.M.T., whose date of birth is February 24, 2018, and we reverse the judgment insofar as it awards alimony to the wife and divides the marital property.

## Procedural Background

On February 9, 2023, the wife filed in the trial court a petition seeking custody of P.E.T. and G.M.T. ("the children");[1] that petition was assigned case number DR-23-63. Thereafter, the husband filed a complaint for a legal separation and a verified petition for emergency pendente lite relief; we refer to the proceeding commenced by the husband's complaint for a legal separation as "the legal-separation action."[2] On February 21, 2023, a pendente lite hearing was conducted, and, on March 1, 2023, the trial court entered a pendente lite order that, among other things, awarded the husband sole legal and physical custody of the children; awarded the wife four hours of visitation each week to be

[1]The wife's petition for child custody is not included in the record on appeal.

[2]The husband's complaint for a legal separation and verified petition for emergency pendente lite relief are not included in the record on appeal, so it is unclear when the husband filed those pleadings.

2

supervised by either Rejuvenating Families, LLC, or a person chosen by the husband; ordered the husband and the wife to participate in psychological evaluations to be conducted by Dr. Kimberly Ackerson; and awarded the wife $2,000 per month in temporary spousal support. Also, on February 21, 2023, the trial court appointed a guardian ad litem to advocate for the best interests of the children.[3]

On March 10, 2023, the wife filed a complaint for a divorce in the trial court; that complaint was assigned case number DR-23-900221 ("the divorce action"). On March 14, 2023, the trial court, at the request of the wife, consolidated the legal-separation action and the divorce action.

The trial was commenced on February 20, 2024, and concluded on February 21, 2024. On June 26, 2024, the trial court entered a judgment that, in pertinent part, divorced the parties; awarded the parties joint legal custody of the children; awarded the husband sole physical custody of the children; awarded the husband final decision-making authority regarding the children; and awarded the wife a graduated visitation schedule that culminated in her exercising unsupervised visitation on the

---

[3]The order appointing the guardian ad litem is not included in the record on appeal.

first, third, and fifth weekends of each month, in addition to a weekly overnight visit and specified holiday visitation. The judgment also ordered the husband to pay to the wife as "rehabilitative alimony, the sum of ... One Thousand Eight Hundred and No/100 ($1,500.00) Dollars per month for a period of twenty Four (24) months, or until the [w]ife shall die, marry, or said periodic alimony terminate[s] otherwise as provided by law, whichever shall first occur" (emphasis in original); awarded each of the parties certain personal property; awarded the husband the martial residence; awarded the wife $3,857.50, representing one-half of the $7,715 equity in the marital residence, as determined by the trial court; and denied all other requested relief.

On July 10, 2024, the trial court, ex mero motu, entered an amended judgment. In its amended judgment, the trial court noted that it had inadvertently entered conflicting provisions regarding its award of rehabilitative alimony. The trial court's amended judgment clarified that the alimony award was for "One Thousand Five Hundred and No/100 ($1,500.00) Dollars per month for a period of Twenty Four (24) months, or until the [w]ife shall die, marry, or said periodic alimony terminate[s] otherwise as provided by law, whichever shall first occur."

4

On July 26, 2024, and August 8, 2024, the husband and the wife, respectively, filed motions seeking to alter, amend, or vacate the judgment as amended. In her postjudgment motion, the wife argued, among other things, that the division of the marital property and the award of alimony were not supported by the evidence and that, regarding the award of alimony, the trial court had failed to make the findings of fact required by § 30-2-57(a), Ala. Code 1975. A hearing on the parties' postjudgment motions was conducted on October 18, 2024; however, the trial court failed to enter an order on the motions, resulting in the postjudgment motions being denied by operation of law. See Rule 59.1, Ala. R. Civ. P. On December 13, 2024, the wife filed a timely notice of appeal to this court.

### The Evidence

The wife, who was 33 years old at the time of the trial, testified that she and the husband had married on April 28, 2012. Before the parties married, the wife had worked at a Publix grocery store. For the first few years of the marriage, the wife worked as an assistant teacher at a preschool and as a nanny. According to the wife, approximately two years into the marriage, she had stopped working outside the home.

In November 2022, the wife obtained employment as a photo editor with Tastic Photo earning $15 per hour. According to the wife, she earned $12,616.25 in 2023 while employed by Tastic Photo. Also, in 2023, the wife earned an additional $3,600 for landscaping services that she provided. At the time of the trial, the wife continued to work for Tastic Photo. She testified that, on her income, she was unable to meet her monthly expenses without financial assistance from the husband. She requested that the trial court award her alimony; however, she neither requested a specific monthly amount nor requested alimony for a specific duration.

The wife began exercising supervised visitation with the children in March 2023, following the pendente lite hearing. Before March 2023, the wife had been the primary caregiver for the children. The wife testified that, among her parental obligations, she had been responsible for homeschooling the children.

According to the husband, he and the wife had defined household roles during the marriage. He testified that the wife had been responsible for homeschooling the children as well as for certain domestic obligations, including cooking, cleaning, doing the laundry, and providing

6

general care for the children. The husband worked outside the home as an emergency-room physician and assisted the wife with her household tasks when he was home.

The wife had a history of expressing suicidal ideations. The husband said that, in 2015 or 2016, the wife had made a comment to him regarding a previous suicide attempt. Marital issues between the husband and the wife began shortly after their relocation from Birmingham to Huntsville in the summer of 2019. According to the husband, following that relocation, the wife had become reclusive and had begun spending more time by herself in a guest bedroom or in her closet. In January 2020, when the children were four years old and nearly two years old, the wife moved into the guest bedroom and stopped cooking, doing the children's laundry, and homeschooling the older child. In 2021, the wife again expressed suicidal ideations. At that time, the wife had sent the husband a text message that had included statements referencing her committing suicide.

According to the husband, after the wife had moved into the guest bedroom and had stopped performing her household duties, he had assumed the wife's domestic responsibilities. To accommodate the

7

additional demands on his time, the husband said, in the summer of 2021 he had asked his employer to allow him to begin working part-time so that he could be home to provide care for the children. The husband scaled back his work hours and worked 8 to 10 days per month.

In August 2022, the husband assumed the responsibility of homeschooling the children. According to the wife, she had not requested that the husband assume her educational role for the children. At the time of the trial, the wife had no role in the children's homeschooling.

The husband expressed concerns that he and the wife had employed differing parenting styles, which, he said, had resulted in two sets of rules for the children. He opined that the wife had employed rules that were overly strict, such as prohibiting the children from comingling different types of toys, prohibiting the children from playing inside the home, and prohibiting the showing of "false mercy" to the children. As an example of "false mercy," the husband confirmed that the wife had insisted that the children either must eat the food they were given or go hungry. According to the husband, he had attempted to discuss those issues with the wife, who, he said, in response, had yelled at him in front of the

8

children. The husband denied that he had "fussed" at the wife for not following his rules.

According to the husband, he and the wife were unable to effectively coparent the children. The husband requested that he be awarded sole physical custody and sole legal custody of the children. Regarding the wife's visitation with the children, the husband requested that the wife continue to exercise her then-current schedule of two four-hour supervised visits per week. He, however, objected to the wife's parents supervising the wife's visits.

At the time of the trial, the husband maintained his part-time employment and was working on average eight shifts per month that were nine hours in duration. According to the husband, his part-time annual gross income totaled $243,627.50 and his monthly living expenses totaled $11,695. The husband's reported monthly living expenses included $4,615 per month for the husband's student-loan payment, which, he said, would be paid off approximately 14 months following the trial. According to the husband, considering his part-time work schedule and his monthly expenses, he was unable to continue to pay the wife $2,000 per month in spousal support that he had been ordered to pay

pendente lite. He conceded that he could work more shifts to increase his income so that he could pay the pendente lite alimony, but, he said, he would prefer not to do so. The husband opined that the wife, who at the time of the trial was earning approximately $15,000 per year, was underemployed. He requested that, if the trial court was inclined to award the wife alimony, the trial court limit the award to $1,000 per month for a year in duration.

Regarding the distribution of the marital assets and debt, the husband requested that he be awarded the marital residence, which according to him was valued at $312,800; that he be solely responsible for the $305,085 outstanding balance owed on the mortgage; that he be awarded his 2012 Hyundai Elantra automobile, which had no associated debt and which he valued at between $3,000 and $4,000; and that the wife be awarded her 2013 Toyota Sienna minivan, which also had no associated debt and which he valued at $9,322. He also requested that his Huntsville Hospital 401(k) retirement account and his Huntsville Hospital 457(b) retirement account, which he valued at $48,124.14 and $22,423.36, respectively, be equally divided; that he be awarded his Reginal Caeli Trust-MySolo 401(k) account, which he valued at $30,000;

10

and that the parties' joint banking accounts, which had nominal balances, be closed. He testified that he would agree to be solely responsible for his student-loan debt, which totaled $57,836.85, and for his American Express and Citibank credit-card debts, which totaled $1,460.96 and $1,304.56, respectively. He requested that, if the trial court opted to award the wife a portion of his Ally Bank savings account, which had a balance of $53,386.19, that it take into consideration the wife's having received $14,000 at the time of the parties' separation.

Dr. Ackerson testified that she had conducted psychological evaluations on the husband and the wife. According to Dr. Ackerson, during her evaluation, the wife had indicated that the husband had been abusive and controlling during the marriage. Dr. Ackerson testified that the wife was not "wholly inaccurate" but opined that the wife had "mischaracterized" the husband's behavior. To illustrate her position, Dr. Ackerson pointed to the decision for the husband to take over homeschooling the children. Regarding that decision, the husband had informed Dr. Ackerson that, at some point, the wife had "pulled away from homeschooling" the children so, in an effort to assist the wife, he had stepped in and assumed the role of homeschooling the children. The

wife, however, had viewed that action as the husband's being "controlling and manipulative." Dr. Ackerson testified that differing views were not uncommon for divorcing couples.

Regarding the husband's psychological evaluation, Dr. Ackerson summarized her findings as follows:

> "And so in reviewing the clinical profile, there was no indication of any serious psychiatric disturbance, disturbing personality traits, or behavioral concern such as substance abuse. He -- through his responses, he reported being satisfied with his current situation and coping abilities. He didn't really see a need for any significant changes on his part. The test also suggested that within social situations [the husband] would be -- probably tend to be more modest and maybe even struggle to assert himself at times and that -- but at the same time, he probably gravitates toward relationships that he might receive some recognition or even attention. Finally[,] he endorsed having a very close, supportive network of family ... and friends and felt confident in his ability to interact with others."

For treatment, Dr. Ackerson recommended that the husband continue his therapy to deal with the end of the marriage and to assist the husband with understanding better approaches to situations and issues regarding the children when interacting with the wife.

Dr. Ackerson's evaluation of the wife included having meetings with her as well as the use of collateral resources. According to Dr. Ackerson, the wife had experienced periods of depression and anxiety

and, at times, had engaged in behaviors that did not exhibit good coping strategies. To illustrate that concern, Dr. Ackerson referenced an incident before the parties' separation during which the wife had gotten upset and had left the marital residence in her vehicle. At some point while driving, the wife had stopped her vehicle in the road and had walked away from the vehicle for such a duration that police had been called. According to Dr. Ackerson, when she had discussed that incident with the wife, the wife had informed her that she had walked into a field, or some wooded area, and had cried until she had fallen asleep. On another occasion, the wife left the marital residence without notifying the husband and traveled to Florida, where she had remained for some time. Dr. Ackerson said that the husband had been unaware of the wife's whereabouts during that period until he had contacted a member of the wife's family who had informed him of the wife's being in Florida.

Regarding the wife's psychological evaluation, Dr. Ackerson testified:

> "Well, similarly, [the wife] was revealed to have been open and honest in responding to the questions. There was no indication of defensiveness or that she was attempting to present herself in a favorable light, which you can sometimes see in these situations. The clinical profile revealed that she was struggling with specific fears and worries that might have

13

been related to some past traumatic event. Now, of course, this test doesn't identify what the trauma was."

Dr. Ackerson continued:

"So [the wife] is still experiencing worries and fears related to this experience and these events, and she still feels that these fears and anxieties and worries still affect her. There were also indications of low self-confidence and social anxiety. And she also revealed a significant distrust of others, and the test suggests she likely presents as very skeptical, vigilant, and possibly even guarded."

Based on her evaluation of the wife, Dr. Ackerson determined that the wife suffered from borderline personality disorder, which she described as follows:

"So borderline personality disorder refers to a set of characteristic traits that reflect the person's manner of thinking, their feelings, and their behaviors. These characteristic traits are pervasive across situations. They deviate from cultural expectations. So they're noticeable. They're not something that most people would engage in. And it causes distress or problems in their overall functioning[,] especially within social situations. And these characteristics tend to be persistent. For the borderline personality disorder in particular, these individuals have difficulty modulating and regulating their emotional responses. So their emotional responses tend to be overdramatic or heightened for the situation at hand. And they also tend to persist with these kind[s] of emotional responses, and they have trouble getting back down to what we would call a baseline or stable level.

"The other thing about [persons suffering from] borderline [personality disorder] that is concerning is that their emotional responses are in response to self-perceived

14

stressors, which may not be readily recognized by others and may even be irrational. And so they are responding to their internal stress, but other people around may not be able to recognize that, which is one of the reasons people with this disorder have difficulty engaging in relationships and interactions."

According to Dr. Ackerson, treatment for individuals who suffer from borderline personality disorder includes psychotherapy with various modes of treatment, including cognitive behavioral therapy or dialectical behavior therapy. Additionally, according to Dr. Ackerson, individuals with personality disorders often experience periods of depression and anxiety, so, she said, a psychiatric evaluation is also recommended to determine if there might be a need for medication to assist a patient with emotional regulation and better emotional control. Dr. Ackerson submitted a written report that contained her final summary and recommendations. For treatment, Dr. Ackerson recommended that the wife be evaluated by a psychiatrist due to her history of anxiety and periods of depression accompanied by suicidal ideations. Dr. Ackerson further observed that, while medication may not be immediately necessary, the wife should establish a relationship with a mental-health professional who could facilitate medication as a treatment option if needed.

Dr. Ackerson said that she had discussed mental-health treatment with the wife, who, she said, had indicated that she did not feel that she needed medication. Despite the wife's hesitancy to take medication, Dr. Ackerson opined that the wife had insight and understanding that some of her responses and behaviors had not been appropriate and that the wife had recognized that she needed to make some changes.

Dr. Ackerson did not believe that the husband and the wife could effectively coparent. She stated:

> "There is still a lot of mistrust I think amongst both parties. I think that, you know, again, [the wife's] difficulty with the give-and-take of communication, her heightened suspiciousness and vigilance, especially about [the husband], I think would lead her to second-guess any recommendations or suggestions or requests that he makes. And so the focus would become more on what the individuals are talking about as opposed to the children. And so the needs of the parents right now are a little bit predominant, and because of that, they can't come together for the children."

Regarding the wife's visitation with the children, Dr. Ackerson opined that the wife's supervised visitation should be gradually increased in frequency and duration. She further opined that the supervision requirement also should be gradually eliminated. Despite her recommendation that the wife's visitation be expanded and gradually transitioned to unsupervised, Dr. Ackerson did not believe that the wife

16

should exercise any final decision-making authority for the children. She based that recommendation on her concerns regarding the wife's judgment and some of her past behavior. Specifically, Dr. Ackerson expressed concern about the wife's unwillingness to discuss issues, to confide in the husband any difficulties that the children were experiencing, and to elicit his suggestions and recommendations.

Paula Erskine testified that she had been employed by the husband and by the wife to supervise visitation between the wife and the children. She had provided those services for approximately one year at the time of the trial. During that period, Erskine said, she had supervised more than 20 visits, which had occurred in both public and private locations. She opined that the wife and the children had a loving and affectionate relationship. She denied that she had observed the wife place the children in any harm and confirmed that the wife had responded appropriately to the children's wants and needs. Erskine opined that she had not seen any behavior from the wife that would have caused her concern if the wife's visits had been unsupervised. She confirmed, however, that she had not been aware of the wife's mental-health history.

17

## Discussion

On appeal, the wife challenges the trial court's award of rehabilitative alimony, the division of the marital property, and the award to the husband of final decision-making authority regarding the children. We first consider the wife's argument regarding the award of final decision-making authority.

In its judgment, as amended, the trial court awarded the parties "joint legal custody" of the children and awarded the husband sole physical custody. The trial court specifically awarded the husband "final decision[-]making authority regarding the ... children." In her brief to this court, the wife contends that the trial court's award of final decision-making authority to the husband constitutes an award of sole legal custody to the husband and that the trial court erred by not awarding the wife some decision-making authority. She cites Ala. Code 1975, § 30-3-151, Rogers v. Hartsock, 323 So. 3d 1233 (Ala. Civ. App. 2020), Bentley v. Bentley, 222 So. 3d 1165 (Ala. Civ. App. 2016), and Gallant v. Gallant, 184 So. 3d 387 (Ala. Civ. App. 2014), to support her argument.

We first consider the wife's assertion that the trial court's award of final decision-making authority to the husband constitutes an award of

sole legal custody of the children to the husband. Section 30-3-151(2), Ala. Code 1975, defines "joint legal custody" as "[b]oth parents hav[ing] equal rights and responsibilities for major decisions concerning the child, including, but not limited to, the education of the child, health care, and religious training." That Code section further provides that "[t]he court may designate one parent to have sole power to make certain decisions while both parents retain equal rights and responsibilities for other decisions." "Sole legal custody" is defined in § 30-3-151(4) as "[o]ne parent ha[ving] sole rights and responsibilities to make major decisions concerning the child, including, but not limited to, the education of the child, health care, and religions training."

In Gallant, this court reviewed a judgment entered by the Elmore Circuit Court that had, among other things, denied a father's petition to modify the physical custody of the four children from his former marriage to the mother and had granted a petition that had been filed by the mother seeking to modify the legal custody of the parties' children. 184 So. 3d at 391-92. Regarding the modification of legal custody, the Elmore Circuit Court had altered the previous joint-legal-custody award, pursuant to which each parent had been given equal authority and

responsibility over major decisions affecting the children, such that the mother was vested with the "final authority" to make decisions that "touche[d] upon the health, education and/or welfare of the children." Id. at 403. In affirming the judgment, this court, taking into consideration the definition of "joint legal custody" provided in § 30-3-151(2), agreed with the father that "the judgment, as modified, [did] not give him final authority over any aspect of the children's lives, so the mother must now be considered the sole legal custodian of the children, subject only to the father's limited rights under the terms of the judgment." Id.

Two years after affirming the Elmore Circuit Courts' judgment in Gallant, this court, in Bentley, considered a similar issue regarding an award of child custody. In Bentley, the father appealed from a judgment entered by the Jefferson Circuit Court that had divorced him and the mother and had, among other provisions, awarded the parties "shared custody, with the primary residence being with the [mother]." 222 So. 3d at 1167. The divorce judgment had further awarded the mother "primary authority and responsibility" in the event the mother and the father were unable to agree on "academic, religious, civic, cultural, athletic or medical and dental, activities of the minor children." Id.

On appeal, the father challenged, among other things, the Jefferson Circuit Court's determination regarding child custody. Id. at 1169. Specifically, he argued that the judgment was inconsistent because the Jefferson Circuit Court had concluded that "shared" custody was in the best interests of the children but had granted to the mother final decision-making authority regarding the children. Id. In affirming the judgment, this court, citing § 30-3-151 and our decision in Gallant, determined that the divorce judgment had awarded the mother sole physical custody and sole legal custody of the children. Id. at 1169-70.

Similarly, in Rogers, this court considered a judgment that had been entered by the Shelby Circuit Court that had modified certain provisions of a 2017 divorce judgment. 323 So. 3d at 1234-35. Regarding custody of the child at issue in that case, the mother and the father had entered into an agreement that was incorporated into the divorce judgment, pursuant to which the parties had agreed that the mother would have sole physical custody of the child and the mother and the father were designated as "joint legal custodians." Id. The parties' agreement further provided that the mother "'shall be the tie breaker for any academic, medical, religious, etc. decisions in which the parties

21

cannot agree upon.'" Id. at 1235. In its modification judgment, the Shelby Circuit Court expressly designated the mother as the sole legal custodian of the child. Id.

On appeal, the father, in addition to raising other issues, attacked the propriety of the provision of the modification judgment that designated the mother as the sole legal custodian. Id. at 1237-38. In affirming that part of the modification judgment designating the mother as the sole legal custodian of the child, this court, citing § 30-3-151(2) and Gallant, determined that the Shelby Circuit Court's modification judgment did not truly affect any of the substantial legal rights that the father may have had under the divorce judgment. This court reasoned:

> "Similarly, in this case, although the divorce judgment incorporated the parties' agreement that designated both the father and the mother as legal custodians, the divorce judgment named the mother as the 'tie breaker' in the event of any future disputes regarding decisions affecting the child. Stated another way, the parties' divorce judgment, like the judgment under review in Gallant, did not vest in the father 'final authority over any aspect of the [child]'s li[fe],' 184 So. 3d at 403, and the mother has, in actuality, been the sole legal custodian of the child since the entry of the divorce judgment."

Id. at 1238.

We agree with the wife that the judgment, as amended, does not give her final decision-making authority regarding the children; thus, the

22

husband is now considered the sole legal custodian of the children. See, § 30-3-151, Bentley, Gallant, and Rogers, supra.

To the extent that the wife argues that the trial court erred in awarding the husband sole legal custody, we disagree. Section 30-3-152, Ala. Code 1975, provides, in pertinent part:

"(a) The court shall in every case consider joint custody but may award any form of custody which is determined to be in the best interest of the child. In determining whether joint custody is in the best interest of the child, the court shall consider the same factors considered in awarding sole legal and physical custody and all of the following factors:

"(1) The agreement or lack of agreement of the parents on joint custody.

"(2) The past and present ability of the parents to cooperate with each other and make decisions jointly.

"(3) The ability of the parents to encourage the sharing of love, affection, and contact between the child and the other parent.

"(4) Any history of or potential for child abuse, spouse abuse, or kidnapping.

"(5) The geographic proximity of the parents to each other as this relates to the practical considerations of joint physical custody."

Initially, we note that the evidence in this case pertaining to child custody was conflicting. Regarding that conflicting evidence, it is well established that

> "'"[a]ppellate courts do not sit in judgment of disputed evidence that was presented <u>ore tenus</u> before the trial court ...."' <u>Ex parte Roberts</u>, 796 So. 2d 349, 351 (Ala. 2001) (quoting <u>Ex parte Bryowsky</u>, 676 So. 2d 1322, 1324 (Ala. 1996)). 'When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.' <u>Delbridge v. Civil Serv. Bd. of Tuscaloosa</u>, 481 So. 2d 911, 913 (Ala. Civ. App. 1985). '[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.' <u>Ex parte Foley</u>, 864 So. 2d 1094, 1099 (Ala. 2003) (citations omitted)."

<u>Ex parte R.E.C.</u>, 899 So. 2d 272, 279 (Ala. 2004).

In her brief to this court, the wife contends that the evidence does not support the trial court's award to the husband of all the decision-making authority regarding the children. She argues that the evidence established that she had been the primary caregiver for the children since their births, that she had a loving and affectionate relationship with the children, and that the visitation supervisor had no safety concerns regarding the interactions between the wife and the children during their visitation. That evidence, according to the wife, tends to support her

contention that she should have been awarded joint legal custody and that she should have been awarded the final decision-making authority regarding the children. Conversely, in his brief to this court, the husband contends that the evidence regarding the wife's mental-health issues, her refusal to acknowledge her mental-health issues, her history of suicidal ideations, and her detachment from the children all tend to support the trial court's legal-custody award and its award to the husband of the final decision-making authority regarding the children.

In its judgment, which followed ore tenus proceedings, the trial court made extensive findings of fact regarding the wife. Those findings include her history of suicidal ideations and her threats to commit suicide; her history of leaving the marital home and being absent from the home for several days before informing the husband of her whereabouts; her abandoning her vehicle in a public roadway to go sit in a field; and her denial that she needs mental-health treatment despite Dr. Ackerson's recommendations that the wife participate in psychotherapy with a psychologist and that the wife be evaluated by a psychiatrist. Taking into consideration our limited review, see Ex parte R.E.C., supra, we find sufficient evidence in the record to support the trial

court's findings of fact as well the trial court's decision to award the husband the final decision-making authority regarding the children.

The wife next contends that the trial court's division of the marital property is inequitable and that its award of alimony to the wife is insufficient. We first consider the wife's argument regarding the trial court's award of alimony. Section 30-2-57, Ala. Code 1975, provides, in pertinent part:

> "(a) Upon granting a divorce or legal separation, the court shall award either rehabilitative or periodic alimony as provided in subsection (b), if the court expressly finds all of the following:
>
> > "(1) A party lacks a separate estate or his or her separate estate is insufficient to enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage.
> >
> > "(2) The other party has the ability to supply those means without undue economic hardship.
> >
> > "(3) The circumstances of the case make it equitable.
>
> "(b) If a party has met the requirements of subsection (a), the court shall award alimony in the following priority:
>
> > "(1) Unless the court expressly finds that rehabilitative alimony is not feasible, the court shall award rehabilitative alimony to the party for a limited duration, not to exceed five years, absent

26

extraordinary circumstances, of an amount to enable the party to acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage.

"(2) In cases in which the court expressly finds that rehabilitation is not feasible, a good-faith attempt at rehabilitation fails, or good-faith rehabilitation only enables the party to partially acquire the ability to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage, the court shall award the party periodic installments of alimony for a duration and an amount to allow the party to preserve, to the extent possible, the economic status quo of the parties as it existed during the marriage as provided in subsection (g)."

In the present case, the trial court's judgment, as amended, states,

in pertinent part:

"In Merrick v. Merrick, 352 So. 3d 770 (Ala. Civ. App. 2021), th[e] court discussed the application of Ala. Code 1975, § 30-2-57, stating: 'The legislature has clearly required that an alimony award be either rehabilitative alimony or periodic alimony and that, to award either type of alimony, the trial court must make certain express findings ….' 352 So. 3d at 775. The Court's previous findings of the jobs and employment history of the parties, the lack of monies available to the [wife] such that this Court did not provide for payment of child support and other findings of fact are sufficient.

"The [husband] shall pay to the [wife], as rehabilitative alimony, the sum of and One Thousand Five Hundred and No/100 ($1,500.00) Dollars per month for a period of Twenty Four (24) months, or until the [wife] shall die, marry, or said periodic alimony terminate[s] otherwise as provided by law,

27

whichever shall first occur. Said payments shall begin on the first (1st) day of August 2024."

In Lopez v. Rodriguez, 379 So. 3d 455, 461 (Ala. Civ. App. 2023), this court considered an argument that the division of the marital property and the award of alimony in that case were inequitable. In reversing the judgment in that case, this court stated, in pertinent part:

> "As to the periodic-alimony award, in Merrick v. Merrick, 352 So. 3d 770 (Ala. Civ. App. 2021), this court discussed the application of Ala. Code 1975, § 30-2-57, stating: 'The legislature has clearly required that an alimony award be either rehabilitative alimony or periodic alimony and that, to award either type of alimony, the trial court must make certain express findings ....' 352 So. 3d at 775. Those requirements include findings as to those matters discussed in § 30-2-57(a), Ala. Code 1975, and, if a periodic-alimony award is to be made, a finding 'that rehabilitative alimony is not feasible,' § 30-2-57(b)(1), Ala. Code 1975, based upon the trial court's consideration of the various factors described in § 30-2-57(d) & (f), Ala. Code 1975.

Lopez, 379 So. 3d at 461. Quoting Turnbo v. Turnbo, 938 So. 2d 425, 430 (Ala. Civ. App. 2006), for the proposition that "'[t]he issues of property division and alimony are interrelated, and they must be considered together on appeal,'" this court pretermitted any discussion regarding the equity of the division of the marital property and reversed the judgment in that case with instructions that, on remand, the trial court enter a new judgment in compliance with § 30-2-57 and that it reconsider

28

the division of the marital property in conjunction with any alimony determination. Lopez, 379 So. 3d at 462.

In the present case, like in Lopez, the trial court failed to make the express findings required by § 30-2-57(a). Accordingly, like in Lopez, we reverse the trial court's judgment, and we remand the case to the trial court with instructions that it enter a new judgment in compliance with § 30-2-57(a). On remand, the trial court shall make the required findings of fact in support of its determination. Because the issues of property division and alimony are interrelated and must be considered together on appeal, see Turnbo and Lopez, supra, we pretermit any discussion regarding the equity of the division of the marital property in this case.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.